1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11    JOSEPH F. FRANKL, Regional Director          No. 2:14-cv-02766-KJM-EFB
      of Region 20 of the National Labor
12    Relations Board, for and on behalf of the
      NATIONAL LABOR RELATIONS
13    BOARD,                                        ORDER

14                    Petitioner,

15         v.

16    ADAMS & ASSOCIATES, INC.,

17                    Respondent.

18

19            This matter is before the court on the petition by Joseph F. Frankl, Regional

20    Director of Region 20 of the National Labor Relations Board ("NLRB" or "Board"), for

21    temporary relief under 29 U.S.C. § 160(j), pending resolution of petitioner's unfair labor practices

22    claim before the Board.  (Pet. for Inj., ECF No. 1.)  Respondent Adams & Associates, Inc.

23    ("Adams" or "respondent") opposes the motion.  (Resp't Opp'n, ECF No. 17.)  The court held a

24    hearing on January 23, 2015, at which Joseph Richardson appeared for petitioner and Michael

25    Pedhirney appeared for respondent.  As explained below, the court GRANTS the motion.

26    /////

27    /////

28    /////

                                              1

1    I.        BACKGROUND

2              A.      Regulatory Framework

3                     An understanding of the regulatory framework and the administrative process of

4    unfair labor-practice adjudications informs the court's decision on petitioner's motion for an

5    injunction.  Section 7 of the National Labor Relations Act ("NLRA") guarantees employees the

6    right to "self-organization, to form, join, or assist labor organizations, to bargain collectively

7    through representatives of their own choosing, and to engage in other concerted activities for the

8    purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8

9    prohibits employers from engaging in "unfair labor practices," including interfering with,

10   restraining, or coercing employees in the exercise of their section 7 rights, *id.* § 158(a)(1), and

11   prohibits employers from discriminating against employees "in regard to hire or tenure of

12   employment or any term or condition of employment to encourage or discourage membership in

13   any labor organization," *id.* § 158(a)(3).

14                    The NLRA also empowers the NLRB to adjudicate labor disputes, including

15   "unfair labor practices" charges filed by private parties.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S.

16   132, 138 (1975).  "[T]he process of adjudicating unfair labor practice cases begins with the filing

17   by a private party of a 'charge.'"  *Id.* (citations omitted).  Then the NLRB's Office of General

18   Counsel investigates the charge and decides whether a "complaint" should be filed.  *See id.* at

19   138–39.  As a practical matter, the General Counsel has delegated the initial determination of

20   whether to issue a complaint to NLRB Regional Directors.  29 C.F.R. §§ 101.8, 102.10.

21   Petitioner here is the Regional Director for Region 20, which includes Northern California.

22                    Once a complaint has been filed, an Administrative Law Judge ("ALJ") presides

23   over a formal trial and files a decision.  If no timely exceptions to the ALJ's decision are filed, the

24   ALJ's decision automatically becomes the decision of the Board; otherwise, the Board will

25   review and decide whether there has been an unfair labor practice.  The Board's decision may

26   then be enforced by, or appealed to, a federal court of appeals.  *Id.* §§ 101.10–101.12.

27                    It "takes considerable time—sometimes years—for the administrative process to

28   conclude."  *Frankl v. HTH Corp.* (*HTH Corp. I* ), 650 F.3d 1334, 1340 (9th Cir. 2011).  "As a

1   result of 'the relatively slow procedure of Board hearing and order, followed many months later

2   by an enforcing decree of the circuit court of appeals it may be possible for persons violating the

3   act to accomplish their unlawful objective before being placed under any legal restraint and

4   thereby to make it impossible or not feasible for the Board to restore the status quo." *Id.* (internal

5   alteration and quotation marks omitted) (quoting S. Rep. No. 80–105, at 27 (1947)).  The NLRA

6   was amended to include section 10(j) to remedy this problem.  *Id.*

7           Importantly for a decision on the pending motion, section 10(j) of the NLRA, 29

8   U.S.C. § 160(j), empowers the NLRB to apply to a federal district court for temporary injunctive

9   relief once a complaint has issued asserting that a company is engaging in an unfair labor

10  practice.  In this case, on June 10, 2014, the Sacramento Job Corps Federation of Teachers, AFT

11  Local 4986 ("Union"), filed a charge with the NLRB, alleging respondent engaged in unfair labor

12  practices in violation of section 8(a)(1), (3), and (5) of the NLRA.  (ECF No. 1 at 2.)

13  Subsequently, the Union amended this charge twice.  (*Id.*)  On October 1, 2014, the Union filed a

14  second charge, alleging further violations of the NLRA.  (*Id.*)  Both charges were referred to

15  petitioner Regional Director, who, upon investigation, issued an amended consolidated complaint

16  against respondent.  (*Id.* at 3.)  At hearing, petitioner's counsel clarified that the Board approved

17  the complaint.  Also at the time of the hearing on the instant motion, the parties notified the court

18  that a hearing was scheduled before the ALJ on January 26, 2015.  As of the date of this order, the

19  parties have not provided any further information on the outcome of that hearing.

20          B.      Facts Likely to Be Proven

21          The court notes at the outset that, "[i]n a § 10(j) case, the district court is not the

22  ultimate fact-finder, but merely determines what facts are 'likely to be proven' to determine if the

23  standard for an injunction has been met."  *Pye ex rel. N.L.R.B. v. Excel Case Ready*, 238 F.3d 69,

24  71 n.2 (1st Cir. 2001) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 25 (1st Cir. 1986)).  The

25  following factual background is drawn from petitioner's and respondent's submitted evidence,

26  and the court has weighed the evidence only to the extent necessary to determine the facts "likely

27  to be proven" with respect to the requested injunction.  *Id.*

28

3

1          Respondent operates youth and children's programs for governmental agencies

2    and has operated at the Sacramento Job Corps Center ("Center") since March 2014.  (Gagnon

3    Decl. ¶¶ 3, 5, ECF No. 17-7.)  Specifically, respondent is responsible for the residential,

4    counseling, career, preparation, career transition, and wellness services functions at the Center.

5    (*Id.* ¶ 5.)  Genesther M. Taylor ("Ms. Taylor"), the individual at issue in the complaint, worked as

6    a Resident Advisor ("RA") at the Center from August 2008 to March 2014.  (Taylor Aff. at 24,

7    ECF No. 7-3.)  At the time Ms. Taylor began working at the Center, her employer was Horizons

8    Youth Services ("Horizons"), respondent's predecessor.  (*Id.*)  Ms. Taylor became the president

9    of the Union approximately four years ago, in or about 2011.  (*Id.* at 2.)

10          Before starting its operation at the Center, respondent initiated various activities to

11    facilitate the transition from Horizons to respondent.  (Gagnon Decl. ¶ 8, ECF No. 17-7.)  With

12    that purpose, respondent's Executive Director, Jimmy Gagnon ("Mr. Gagnon"), visited the Center

13    in February 2014 to conduct interviews for the Deputy Center Director position, the highest-

14    ranking position at the Center.  (*Id.*)  After conducting interviews, Mr. Gagnon hired Kelly

15    McGillis ("Ms. McGillis") as the Deputy Center Director.  (*Id.*)  Because respondent had a short

16    period within which to conduct interviews for open positions, it had "several representatives at

17    the site to conduct job interviews, including Mr. Gagnon, Ms. McGillis, respondent's then-

18    Human Resources Director Valerie Weldon, and six other individuals.  (*Id.* ¶ 12.)  While Mr.

19    Gagnon was the final decision-maker as to whom to hire, he "relied heavily on the feedback of

20    the interviewers."  (*Id.*)

21          Before conducting interviews, respondent's managers consulted with Horizons'

22    managers about the qualifications of potential employees.  (ECF No. 7 at 6–7.)  One of Horizons'

23    managers with whom Ms. McGillis consulted was Residential Manager Lee Bowman.  (Bowman

24    Decl. ¶¶ 5–7, ECF No. 17-8.)  Based on her consultation, Ms. McGillis signed a form entitled

25    "Justification for Disqualification of Potential Employment" for Ms. Taylor on February 27,

26    2014, the day before Ms. Taylor's interview date.  (McGillis Decl. ¶ 14, ECF No. 17-3.)  That

27    form, in relevant part, provides: "Genesther Taylor is not eligible and/or qualified to [sic] an offer

28    of employment with Adams and Associates, Inc., . . . for the following reason[]: Adams has a

1  reason to believe, based upon written credible information from a knowledgeable source, that this

2  employee's job performance while working on the current contract has been unsuitable." (ECF

3  No. 7-3 at 97.)

4            Respondent began interviewing applicants for the RA positions on February 27,

5  2014. (ECF No. 7 at 7; ECF No. 7-3, Ex. 5.) Respondent documented each interview with an

6  Interview Evaluation Form, on which the interviewer graded an applicant with a numerical score

7  between one and four in nine categories, with a score of one being the best. (ECF No. 7-3, Ex. 5.)

8  Ms. Taylor interviewed with Ms. McGillis for an RA position on February 28, 2014. (McGillis

9  Decl. ¶ 16, ECF No. 17-3.) Ms. McGillis recorded her impressions of Ms. Taylor on an Interview

10  Evaluation Form and a File Note. (ECF No. 7-3 at 92–97.) Respondent did not extend Ms.

11  Taylor a job offer. (Gagnon Decl. ¶ 15, ECF No. 17-7.) It did, however, hire the Union's Vice

12  President, Charles King, and Shop Steward, Sheila Broadnax. (ECF No. 17 at 16 n.12.)

13  II.      STANDARD

14            Section 10(j) authorizes a district court to grant injunctive relief "it deems just and

15  proper." 29 U.S.C. § 160(j). "To decide whether granting a request for interim relief under

16  Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in

17  deciding whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC*, 593

18  F.3d 950, 957 (9th Cir. 2010).

19            A court may issue a preliminary injunction to preserve the relative positions of the

20  parties pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The

21  party seeking injunctive relief must show that "he is likely to succeed on the merits, that he is

22  likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

23  tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def.*

24  *Council, Inc.*, 555 U.S. 7, 20 (2008).

25            Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or

26  "serious question" test, which allowed a court to balance the elements of the test "so that a

27  stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild*

28  *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Recently, the Circuit found that its

1   sliding scale test survived *Winter*: a court may issue a preliminary injunction when a petitioner

2   raises serious questions going to the merits and demonstrates that the balance of hardships tips

3   sharply in his favor, so long as the court also considers the remaining two prongs of

4   the *Winter* test.  *Id.* at 1135.  However, a court need not reach the other prongs if the moving

5   party cannot as a threshold matter demonstrate a "fair chance of success on the merits."  *Pimentel*

6   *v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (internal quotation marks omitted).

7        "In all [NLRA] cases, however, the Regional Director must establish that

8   irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."  *HTH*

9   *Corp I*, 650 F.3d at 1355.  Moreover, the court "must evaluate the traditional equitable criteria

10  through the prism of the underlying purpose of section 10(j), which is to protect the integrity of

11  the collective bargaining process and to preserve the Board's remedial power."  *Id.*

12       A district court's grant of a § 10(j) preliminary injunction will be reversed "only

13  where the district court abused its discretion or based its decision on an erroneous legal standard

14  or on clearly erroneous findings of fact."  *Id.*

15       A.    Likelihood of Success on the Merits

16       "On a § 10(j) petition, likelihood of success is a function of the probability that the

17  Board will issue an order determining that the unfair labor practices alleged by the Regional

18  Director occurred" and that a federal court of appeals "would grant a petition enforcing that order,

19  if such enforcement were sought."  *HTH Corp. I*, 650 F.3d at 1355.  In making this determination,

20  the court must "factor in the district court's lack of jurisdiction over unfair labor practices, and the

21  deference accorded to NLRB determinations by the courts of appeals."  *Miller for & on Behalf of*

22  *NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994).  Accordingly, "the regional

23  director in a § 10(j) proceeding 'can make a threshold showing of likelihood of success by

24  producing some evidence to support the unfair labor practice charge, together with an arguable

25  legal theory.'"  *HTH Corp. I*, 650 F.3d at 1356.  "But if the Director does not show that success is

26  likely, and instead shows only that there are serious questions going to the merits, then he must

27  show that the balance of hardships tilts sharply in his favor," as well as the other equitable

28  /////

1   elements for preliminary injunctive relief.  *Id.* (citing *Alliance for the Wild Rockies*, 632 F.3d at

2   1135).

3          Moreover, in this case, the court accords "the Regional Director special deference

4   because the Board took the rare step of endorsing the Director's Section 10(j) petition."

5   *Frankl ex rel. NLRB v. HTH Corp.* (*HTH Corp. II* ), 693 F.3d 1051, 1062 (9th Cir. 2012).

6   Deference is warranted here because the Board's endorsement may "signal [its] future decision on

7   the merits, assuming the facts alleged in the petition withstand examination at trial."  *Id.*

8   (quoting *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011)).

9          Petitioner contends respondent has engaged in unfair labor practices in violation of

10   the NLRA in two ways: (1) respondent did not hire Genesther Taylor ("Ms. Taylor") because of

11   her union activities; and (2) respondent unlawfully barred Ms. Taylor from its property.  (ECF

12   No. 7-2 at 1–2.)  Petitioner asks this court to grant interim injunctive relief under section 10(j) of

13   the NLRA, ordering respondent to (1) restore Ms. Taylor to her former position, or if the position

14   no longer exists, then to a substantially equivalent position; and (2) rescind respondent's rule

15   barring her from the property.  (*Id.* at 3.)

16          Respondent counters Ms. Taylor was not hired because she was not qualified.

17   (ECF No. 17 at 6–9.)  As to Ms. Taylor's access to the center, respondent counters petitioner's

18   request is moot because "Ms. Taylor is now permitted to come on to the site for bargaining and

19   other purposes."  (*Id.* at 25–26.)

20          1.   Respondent's Decision not to Hire Ms. Taylor

21          Petitioner argues there is a strong likelihood he will prove respondent unlawfully

22   refused to hire Ms. Taylor because of her position as the Union president and because of Union

23   related activities.  (ECF No. 7-2 at 16.)

24          Section 8(a)(3) of the NLRA prohibits "discrimination in regard to hire or tenure

25   of employment or any term or condition of employment to encourage or discourage membership

26   in any labor organization . . . ."  29 U.S.C. § 158(a)(3).  A new owner cannot refuse to hire its

27   predecessor's employees solely because of their union membership.  *Scott on Behalf of N.L.R.B.*

28   *v. Pac. Custom Materials, Inc.*, 939 F. Supp. 1443, 1452 (N.D. Cal. 1996).  In a section 8(a)(3)

7

1  case, such as this, the Board uses the burden-shifting scheme articulated in *Wright Line, A*

2  *Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), to determine whether an employer was

3  motivated by anti-union animus.  *Healthcare Employees Union, Local 399, Affiliated With Serv.*

4  *Employees Int'l Union, AFL-CIO v. N.L.R.B.*, 463 F.3d 909, 919 (9th Cir. 2006).  Under *Wright*

5  *Line*, petitioner must "make a prima facie showing sufficient to support the inference" antiunion

6  animus "was a 'motivating factor' in the employer's decision.  Once this is established, the

7  burden will shift to the employer to demonstrate that the same action would have taken place

8  even in the absence of protected conduct."  *Healthcare Emps. Union*, 463 F.3d at 919 (quoting

9  *Wright Line*, 251 N.L.R.B. at 1089).  Although petitioner retains the ultimate burden of

10  persuasion before the Board itself, "once the General Counsel establishes that antiunion animus

11  was a motivating factor, the employer bears the burden of establishing . . . the inevitability of

12  termination."  *Schaeff Inc. v. NLRB*, 113 F.3d 264, 267 n.5 (D.C. Cir. 1997).  "In establishing its

13  *Wright Line* defense, the employer is free to show, for example, that it did not hire particular

14  employees because they were not qualified for the available jobs, and that it would not have hired

15  them for that reason even in the absence of the unlawful considerations.  Similarly, the employer

16  is free to show that it had fewer unit jobs than there were unit employees of the predecessor."

17  *Planned Bldg. Servs., Inc.*, 347 N.L.R.B. 670, 674 (2006).

18  Because the "employer will seldom admit that it was motivated by anti-union

19  animus," "circumstantial evidence is sufficient to establish anti-union" animus was a motivating

20  factor in the decision to terminate an employee.  *Healthcare Emps. Union*, 463 F.3d at 919.

21  Indicia that support an inference that anti-union animus was a motivating factor in the termination

22  of an employee include: (i) the employer's knowledge of the employee's union activity, (ii) the

23  employer's "antipathy toward" union activity, and (iii) "the timing of the adverse employment

24  action."  *E.C. Waste, Inc. v. NLRB*, 359 F.3d 36, 42–43 (1st Cir. 2004); *accord Healthcare Emps.*

25  *Union*, 463 F.3d at 919–20.

26  After carefully considering the parties' arguments and the evidence in the record,

27  as discussed below, the court finds the evidence petitioner has presented sufficient to establish its

28  /////

8

1   likelihood of success on the merits.  It is undisputed that respondent did not hire Ms. Taylor.

2   Thus, the sole question is whether that decision was motived by antiunion animus.

3          First, petitioner is likely to show respondent's knowledge of Ms. Taylor's Union

4   position and activities.  Mr. Gagnon states that Ms. Taylor informed him during three meetings

5   before the interview that she was the Union President.  (Gagnon Aff., ECF No. 7-3 at 76.)  In

6   addition, Mr. Gagnon states he interacted with Ms. Taylor on two other occasions before the

7   completion of the hiring.  (*Id.*)  On one occasion, before respondent had completed its hiring, Ms.

8   Taylor went to the transition office and requested descriptions of available jobs.  (*Id.*)  On another

9   occasion, "as [respondent] was making decisions whether or not to hire," Ms. Taylor inquired

10  about "a hiring decision on another employee."  (*Id.*)  Respondent did not respond to Ms. Taylor's

11  inquiry.  (*Id.*)  Respondent's knowledge of Ms. Taylor's union membership is further

12  corroborated by Ms. McGillis.  (*Id.* at 98.)  Ms. McGillis states that when she interviewed Ms.

13  Taylor, she "was aware that [Ms. Taylor] was the Union President" because Ms. Taylor informed

14  her during the interview about her involvement with the Union and Ms. McGillis "may have

15  known it before then."  (*Id.* at 102.)  Hence, there is sufficient evidence of respondent's

16  knowledge of petitioner's union activities.

17         Second, petitioner is likely to show respondent's decision was motivated by

18  antiunion animus.  For example, on her interview note, Ms. McGillis commented, with no

19  explanation, that when Ms. Taylor went to the transition office, her "behavior was found to be

20  inappropriate and quite demanding."  (*Id.* at 115.)  Ms. Taylor provides a different explanation of

21  her first visit to the transition office.  On February 14, 2014, she went to the transition office and

22  asked to speak with Mr. Gagnon.  (*Id.* at 26.)  But because Mr. Gagnon was unavailable, Ms.

23  Taylor asked another person in the office to "pass on to Gagnon that in [her] capacity as Union

24  President, [she] needed a copy of all documentation handed to the [RAs]."  (*Id.*)  Ms. Taylor

25  never received those documents.  (*Id.*)  The Board can reasonably find that what Ms. McGillis

26  refers to as "inappropriate and quite demanding" behavior was Ms. Taylor exercising her

27  authority, as the Union President, to act for all Union members.  *See Bruce Packing Co., Inc.*, 357

28  N.L.R.B. No. 93, at *18 (Sept. 28, 2011) (noting "accusing an employee of having a 'bad

9

1   attitude' has long been considered a veiled reference to the employee's protected concerted

2   activities"); *Promenade Garage Corp.*, 314 N.L.R.B. 172, 179–80 (1994) (an employer's

3   complaint about an employee's "work attitude" is "an euphemism for a prounion attitude"); *Cook*

4   *Family Foods*, 311 N.L.R.B. 1299, 1319 (1993) (company manager's reference to employee's

5   "bad attitude" deemed, in context, to be a reference to union activities); *McCotter Motors Co.*,

6   291 N.L.R.B. 764, 771 (1988) (manager told employee she had "bad attitude" after she voiced

7   grievances on behalf of other employees, which was deemed evidence of unlawful motive in her

8   subsequent discharge).

9           The Board may also find Ms. McGillis's comment about Ms. Taylor's interview

10   date is additional circumstantial evidence of antiunion animus.  Ms. McGillis found it "odd and

11   concerning" that Ms. Taylor interviewed "on the last day for incumbent applicants to apply."

12   (ECF No. 7-3 at 115.)  Respondent does not explain, and it is unclear to this court, why the date

13   of Ms. Taylor's interview was relevant to respondent's decision not to hire when respondent's

14   purported reason for not hiring Ms. Taylor was that she was unqualified.  Ms. McGillis's

15   comment raises a red flag because respondent did not announce any deadlines for employees to

16   complete their interviews (ECF No. 7-3 at 33–34); respondent was responsible for scheduling the

17   interviews, not the applicants; and Ms. McGillis interviewed and recommended for hire other RA

18   applicants who interviewed on or after the date of Ms. Taylor's interview (*see* ECF No. 7-3 at

19   147–48, 150, 151, 152, 154, 156, 159, 164–67).  *See U.S. Marine Corp.*, 293 N.L.R.B. 669, 670

20   (1989) (an unlawful refusal to hire may be shown by "lack of a convincing rationale for refusal to

21   hire the predecessor's employees; [and] inconsistent hiring practices . . . evidencing a

22   discriminatory motive").

23           Ms. McGillis's characterization of Ms. Taylor's description of the challenges she

24   faced while working as an RA may provide further circumstantial evidence of animus.

25   Specifically, in the interview note, Ms. McGillis states that during the interview, Ms. Taylor

26   "expressed having a challenge and expressed being overwhelmed with the number of students in

27   her charge (38) . . . [and] she had a hard time keeping up with her duties."  (ECF No. 7-3 at 115.)

28   Those comments are inconsistent with Ms. McGillis's own documentation and are contradicted

1    by Ms. Taylor.  For instance, on the interview evaluation form, Ms. McGillis identified the

2    number of students in the dorm as 23 and not 38.  (*Id.* at 114.)  Further, while Ms. Taylor said

3    "some of the students could be challenging," she specified that she "maintained [her]

4    professionalism with them."  (*Id.* at 34.)  She "never said that [she] had trouble handling [her]

5    dorm."  (*Id.*)

6           Ms. McGillis also wrote on the interview note that Ms. Taylor "stated that she was

7    not interested in any other positions except for [RA]" (*id.* at 115), and also noted on the interview

8    evaluation form that Ms. Taylor was not interested in a supervisory position (*id.* at 114).  Ms.

9    McGillis "thought the Resident Coordinator position might be a better fit for [Ms. Taylor] . . .

10   because [Ms. McGillis] wanted . . . to increase [Ms. Taylor's] chances of being hired by applying

11   for more positions."  (*Id.* at 101–02.)  However, Ms. McGillis's explanation is inconsistent with

12   the Disqualification Form, which was prepared before the interview and provides Ms. Gillis is

13   ineligible for employment with respondent.  (*Id.* at 109.)  In addition, Ms. Taylor states that when

14   Ms. McGillis asked her why she only applied for the RA position, Ms. Taylor responded she

15   "could not go for another position because [she] was the Union President and [she] wanted to

16   maintain [her] presidency."  (*Id.* at 34.)  Petitioner's observation is correct: "the Board would

17   reasonably interpret McGillis's observation that [Ms. Taylor] was not interested in a supervisory

18   position as a shorthand reference to [her] desire to remain Union President and to stay in the

19   bargaining unit."  (ECF No. 7 at 21.)

20          In these circumstances, the court finds petitioner has met his burden of making a

21   prima facie showing sufficient to support the inference that antiunion animus was a motivating

22   factor in respondent's decision.  Accordingly, the burden shifts to respondent to demonstrate the

23   same action would have taken place even in the absence of protected conduct.  To overcome the

24   prima facie showing, the employer bears the burden of persuasion.  *Scott on Behalf of N.L.R.B.*,

25   939 F. Supp. at 1453.  Here, the court finds respondent has not rebutted petitioner's prima facie

26   case.

27          Respondent asserts that Ms. McGillis did not recommend Ms. Taylor for hiring

28   "largely based upon Ms. Taylor's representation that she believed that supervising twenty-three

1    sleeping students during the graveyard shift in which the students were sleeping was a

2    'harrowing' experience." (ECF No. 17 at 16.)  Respondent further argues "Ms. McGillis believed

3    that during the interview, Ms. Taylor did not provide Ms. McGillis with any strong sense of her

4    accomplishments, leadership skills, or her interpersonal skills." (*Id.*)  As evidence that Ms.

5    Taylor described her experience of being responsible for twenty-three students "harrowing,"

6    respondent submits Ms. McGillis's declaration. (ECF No. 17-3 at 2–10.)  It provides as follows:

7
> I found this troublesome because Ms. Taylor worked the graveyard
8
> shift for Horizon [sic], during which the students were asleep for
> the most part.  Unlike Horizon, Adams's model was to assign each
9
> [RA] sixty students.  If Ms. Taylor believed that it was "harrowing"
> to supervise twenty-three students who were sleeping, she would be
10
> even more overwhelmed supervising sixty students.

11   (McGillis Decl. ¶ 18, ECF No. 17-3.)

12             As noted above, however, petitioner has introduced sufficient circumstantial

13   evidence, and respondent cannot defeat petitioner's showing simply by presenting conflicting

14   evidence. *HTH Corp. II*, 693 F.3d at 1063 ("Conflicting evidence in the record 'does not

15   preclude the Regional Director from making the requisite showing for a section 10(j)

16   injunction.'" (internal quotation marks omitted)).  In addition, respondent has not explained how

17   Ms. Taylor was not qualified for the RA position when she had been working as an RA for six

18   years before respondent began operating at the Center. (Taylor Aff. at 23, ECF No. 7-3.)

19             The court finds petitioner has demonstrated a likelihood of success on the merits of

20   the unfair labor practice claim at issue.  Petitioner has, at the very least, presented some evidence

21   and an arguable legal theory to support its position. *See HTH Corp. II*, 693 F.3d at 1063.

22             2.    Limitation on Access to Center

23             The court need not analyze petitioner's second basis for relief in depth, in light of

24   its granting the request for Ms. Taylor's instatement. *See Souza v. California Dep't of Transp.*,

25   No. 13-04407, 2014 WL 1760346, at *6 (N.D. Cal. May 2, 2014).  Respondent previously has

26   given Ms. Taylor access to the Center for the purpose of representing union members in

27   grievance proceedings and other union-related matters, including collective-bargaining sessions

28   that occur there.  While respondent suggests its voluntary action moots petitioner's request for

1  full access, it has imposed an advance notification condition on Ms. Taylor's access.  (ECF No.

2  17 at 25–26.)  If Ms. Taylor accepts the instatement offer, she will presumably have access to the

3  Center generally in connection with her work, without the requirement of providing advance

4  notice.  So that her ability to access the Center is unimpeded for all purposes relevant to

5  petitioner's motion, the court grants the requested access provision as well.

6        B.     Irreparable Harm

7        In the section 10(j) context, "irreparable injury is established if a likely unfair

8  labor practice is shown along with a present or impending deleterious effect of the likely unfair

9  labor practice that would likely not be cured by later relief."  *HTH Corp. I*, 650 F.3d at 1362.

10  "[T]he discharge of active and open union supporters risks a serious adverse impact on employee

11  interest in unionization and can create irreparable harm to the collective bargaining process."

12  *Excel Case Ready*, 238 F.3d at 74 (internal quotation marks and alteration omitted).  "Moreover,

13  the fear of employer retaliation after the firing of union supporters is exactly the 'irreparable

14  harm' contemplated by § 10(j)."  *Id.* at 75.  Accordingly, the Ninth Circuit has held "a likelihood

15  of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract

16  negotiations . . . largely establishes likely irreparable harm, absent unusual circumstances."  *HTH*

17  *Corp. I*, 650 F.3d at 1363.

18        Here, as previously discussed, petitioner has shown a likelihood of success on the

19  merits as to a section 8(a)(3) violation, which "establishes likely irreparable harm, absent unusual

20  circumstances."  *Id.* at 1163.  For example, Ms. Taylor affirms that "the number of confirmed

21  members in the bargaining unit has decreased to only two from about twenty or so," (ECF No.

22  17-3 at 38–39).  *See Excel Case Ready*, 238 F.3d at 74 (the chilling effect on unionization and

23  collective bargaining is important harm).  In addition, at the hearing, the parties represented to the

24  court that the Union and respondent have yet to reach an agreement on contract terms.

25        Moreover, respondent's argument that petitioner's delay in filing the § 10(j)

26  petition "weakens [the] claim that irreparable harm will occur in the absence of a preliminary

27  injunction" is unpersuasive.  (ECF No. 17 at 22.)  Here, Ms. Taylor learned about respondent's

28  decision not to hire her in March 2014; the Union filed its first charge on June 10, 2014; the

1   Board issued an amended consolidated complaint on November 24, 2014; and petitioner filed the

2   § 10(j) petition on November 25, 2014.  (ECF No. 1.)  This timeline reflects the reality that the

3   Board must have sufficient amount of time to investigate the charge before filing a petition for

4   injunction.  At the hearing, petitioner's counsel confirmed the timeline was consistent with the

5   NLRB guidelines.  *See HTH Corp. I*, 650 F.3d at 1363; *Reichard v. Foster Poultry Farms*, 425 F.

6   Supp. 2d 1090, 1101 (E.D. Cal. 2006) (five-month passage of time; "[d]elay in the federal

7   bureaucracy is an unfortunate ramification of the operation of government"); *see also Overstreet*

8   *v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (eighteen-month passage of time not

9   a bar to injunction); *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 545 (4th Cir.

10   2009) (same).

11           Accordingly, the court finds that petitioner has shown irreparable harm will likely

12   result in the absence of interim relief.

13           C.      The Balance of Hardships and Public Interest

14           The Ninth Circuit has held that a district court's determination that the "Regional

15   Director had shown likely irreparable harm to the collective bargaining process meant that there

16   was also considerable weight on his side of the balance of the hardships."  *HTH Corp. I*, 650 F.3d

17   at 1365.  Likewise, if "the Director makes a strong showing of likelihood of success and of

18   likelihood of irreparable harm, the Director will have established that preliminary relief is in the

19   public interest."  *Id.*

20           Here, for the reasons stated above, the Regional Director has shown that the unfair

21   labor practice claim will likely succeed and that irreparable harm is likely to result; the balance of

22   hardships and the public interest thus support granting interim relief.

23           Moreover, respondent's argument, that "instating Ms. Taylor would . . . unjustly

24   injure Adams" because it "will necessarily require Adams to terminate a qualified [RA]," is

25   unavailing (ECF No. 17 at 24).  *See Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor*

26   *Co.*, 853 F.2d 744, 750 (9th Cir. 1988) (noting "the rights of the employees who were

27   discriminatorily discharged are superior to the rights of those whom the employer hired to take

28   their places"), *overruled on other grounds by Miller*, 19 F.3d at 457.  In addition, the

14

1   disproportionate impact of not hiring Ms. Taylor, given her leadership position and the small size

2   of the bargaining unit at the Center, also weighs in favor of finding the balance of hardship factor

3   favors petitioner.  (ECF No. 7-3 at 127.)  Finally, the public interest factor weighs in favor of

4   injunction because it is necessary to prevent an alleged unfair labor practice from succeeding due

5   to delay in the administrative process.  *See HTH Corp. I*, 650 F.3d at 1365 (noting "the public

6   interest is to ensure that an unfair labor practice will not succeed because the Board takes too long

7   to investigate and adjudicate the charge).  Accordingly, the injunction promotes the public interest

8   by preserving the NLRB's remedial power, and the balance of hardships favors injunctive

9   relief.  *See id.*  Therefore, the court finds that injunctive relief is in the public interest, and the

10  balance of hardships favors granting petitioner's request for interim relief.

11          Accordingly, the court GRANTS petitioner's request.

12  III.    <u>MOTION TO STRIKE</u>

13          Also pending before the court is respondent's motion to strike.  (ECF No. 21.)

14  Respondent requests that this court strike: (1) the transcript of Valerie Weldon's interview

15  ("Weldon deposition"); (2) the Second Amended Complaint filed by petitioner; and (3) all

16  portions of the reply brief filed by petitioner that refer to the Weldon deposition and to the Second

17  Amended Complaint.  (*Id.* at 1.)  Respondent argues the court should grant its motion "because

18  the Region presented this evidence for the first time, in connection with its Rebuttal

19  Memorandum, thereby depriving Adams the opportunity to address such evidence in its

20  Opposition."  (*Id.*)

21          The court need not address this motion because, in deciding petitioner's motion for

22  temporary relief, the court does not rely on the new facts introduced, for the first time, with

23  petitioner's reply.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("[D]istrict court

24  need not consider arguments raised for the first time in a reply brief.").

25  IV.    <u>EVIDENTIARY OBJECTIONS</u>

26          Concurrent with its opposition brief, respondent has filed evidentiary objections to

27  certain parts of Ms. Taylor's affidavit.  (*See* ECF No. 17-1.)  The court need not address those

28  /////

15

1    objections because it does not rely on the parts of Ms. Taylor's affidavit to which respondent

2    objects in deciding what facts are likely to be proven for purposes of the instant temporary relief.

3    V.    CONCLUSION

4            For the foregoing reasons, the court finds that injunctive relief is "just and proper,"

5    29 U.S.C. § 160(j), and the Regional Director's petition for temporary relief is GRANTED.

6            The court HEREBY ORDERS respondent, its officers, representatives,

7    supervisors, agents, servants, employees, attorneys, and all persons acting on its behalf or in

8    participation with it to take the following steps pending the final disposition of the matter:

9            a.   Offer Genesther Taylor immediate instatement to the job position which she

10                previously held with her predecessor employer Horizons, or to a substantially

11                equivalent position if her position no longer exists, without prejudice to

12                Taylor's rights and privileges, displacing, if necessary, any newly hired outside

13                applicants;

14            b.   Permit Genesther Taylor access to the Sacramento Job Corps Center for the

15                purpose of representing union members in grievance proceedings and other

16                union-related matters (such as collective-bargaining sessions) that occur there;

17            c.   Within fourteen (14) days of the date of this Order, post copies of the District

18                Court's Order at the Sacramento Job Corps Center located in Sacramento,

19                California, in all places where notices to its employees are normally posted;

20                maintain these postings during the Board's administrative proceeding free from

21                all obstructions and defacements; grant all employees free and unrestricted

22                access to said postings; and grant to agents of the Board reasonable access to

23                its facilities to monitor compliance with this posting requirement; and

24            d.   Within twenty-one (21) days of the issuance of this order, file with the court

25                and serve upon the Regional Director of Region 20 of the Board, a sworn

26                affidavit from a responsible official describing with specificity the manner in

27                which respondent has complied with the terms of the Order, including the

28                locations of the posted documents.

1           The court ADDITIONALLY ORDERS that no later than seven (7) days after the

2    ALJ issues the final recommendation, the parties shall file a Joint Status Report with the court

3    briefly setting forth the decision of the ALJ and the schedule for further proceedings before the

4    Board.

5           IT IS SO ORDERED

6    DATED:  February 9, 2014.

7

8    _____

9          UNITED STATES DISTRICT JUDGE

10

17